**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Julio PEREZ, Defendant-Appellant.**

**No. 81–6169.**

United States Court of Appeals,
Eleventh Circuit.

Feb. 22, 1983.

Hugh J. Behan, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Linnea Johnson, Asst. U.S. Atty., Miami, Fla., for plaintiff-appellee.

Before HILL and ANDERSON, Circuit Judges, and LYNNE *, District Judge.

R. LANIER ANDERSON, III, Circuit Judge:

Appellant, Julio Perez, was charged and, after a jury trial, convicted for knowingly and willfully, and with intent to defraud, possessing falsely made and counterfeit obligations of the United States in violation of 18 U.S.C.A. § 472 (West 1976).[1] The trial judge sentenced Perez to a term of one year in prison; however, pursuant to the split sentence provision of 18 U.S.C.A. § 3651 (West Supp.1982), Perez was ordered confined to a jail-type institution for three months with the balance of his incarceration suspended. Perez has served his time in jail and presently is on probation.

Appellant's only contention on this appeal is that the trial judge should have granted his motion for judgment of acquittal because the evidence was insufficient to support the jury's verdict of guilty. In considering appellant's claim of insufficient evidence, this court must view all of the evidence, together with all logical inferences flowing from that evidence, in the light most favorable to the government, and must draw all credibility choices in favor of the finder of fact. *United States v. Gianni*, 678 F.2d 956, 958–59 (11th Cir.1982). The standard of review is whether "a reasonable trier of fact could find that the evidence establishes guilt beyond a reasonable doubt." *United States v. Bell*, 678 F.2d 547, 549 (5th Cir.1982) (Unit B, en banc).[2] Because we find the evidence was sufficient to support the jury's verdict, we affirm.

The record reveals that on July 9, 1981, between eight and eight-thirty p.m., appellant Perez and two of his children approached a "ball-toss" game at the Omni Amusement Center in Miami, Florida. Perez gave the game attendant, Carlos Fernandez-Davilla, a ten-dollar bill in order to play the game.[3] After taking the ten-dollar bill, the game attendant noticed that the bill "felt funny" and asked for a replacement bill.[4] In addition, the game attendant told

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1. 18 U.S.C.A. § 472 (1976) reads as follows: Whoever, with intent to defraud, passes, utters, publishes, or sells, or attempts to pass, utter, publish, or sell, or with like intent brings into the United States or keeps in possession or conceals any falsely made, forged, counterfeited, or altered obligation or other security of the United States, shall be fined not more than $5,000 or imprisoned not more than 15 years, or both.

2. In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir.1982), this court adopted as binding precedent all of the post-September 30, 1981, decisions of Unit B of the former Fifth Circuit. *Id.* at 34.

3. The government points out in its brief that the game cost only one dollar to play. Appellant contends that he and two of his children were going to play and, therefore, that he had to pay three dollars. The record is unclear on this point, and we do not believe it is of great significance to the resolution of the issue on appeal.

4. The record does not clearly indicate how much time passed between the attendant's receipt of the bill and his request to Perez for a new bill. Appellant contends that he and his children had finished playing the game before the attendant informed him that the bill was unacceptable. The government argues that the attendant noticed the bill's deficiencies, and sought a replacement bill, almost immediately. Again, as we view the evidence in this case, this factual dispute is of little importance.

his supervisor about the suspect bill. The supervisor then notified Gerald Green, an off-duty City of Miami police sergeant who worked at the Omni.

Sergeant Green promptly located appellant, who had gathered his family together and was standing near a bus stop in front of the Omni complex. Green told appellant that he wanted to talk with him, and appellant agreed to accompany Green to an office in the Omni complex to answer some questions. When they reached the office, Green notified the United States Secret Service, which promptly sent two agents to assist in the investigation.

After the Secret Service agents arrived, the law enforcement officers searched Perez.[5] The search revealed that Perez had a counterfeit fifty-dollar bill in his wallet and $119 in currency in his left front pants pocket. Three of the bills in the pants pocket, a twenty and two ten's, were counterfeit. The remainder of the bills, five ten's and twenty-nine one-dollar bills, were genuine. Although the counterfeit bills and the genuine bills were kept in the same pocket, the counterfeit bills were segregated from the genuine bills rather than being folded together in a single packet.

The agents also found $77 in genuine currency in Mrs. Perez' purse.[6] Forty-two dollars of this currency, five five's and seventeen one's, were arranged together according to denomination. The remainder of this currency, five five's and ten one's, was arranged in "packets" of five's and one's, each containing a five and several one's. A Secret Service agent subsequently testified that this arrangement of bills into "packets" indicated that counterfeit bills had been passed, *i.e.,* that a person passing counterfeit ten's had made several small purchases, each time receiving change in the form of a five and several one's.

A search of the cash registers at the Omni Amusement Center that evening turned up three counterfeit bills, two twenty's and a ten. The Secret Service agents compared these three counterfeit bills with the counterfeit bills confiscated from Perez and determined that all of the bills had been printed by the same counterfeiter. In addition, several of the bills had identical serial numbers.

 Appellant does not contest the fact that he possessed and attempted to pass counterfeit currency. Appellant correctly points out, however, that the government does not establish a violation of § 472 merely by proving possession or passing. *See United States v. Haggins,* 545 F.2d 1009, 1013 (5th Cir.1977) ("The requisite *mens rea* cannot be proved by a showing of possession or passing alone.").[7] In addition to proof of possession or passing, the government must prove that the defendant acted with intent to defraud. *See United States v. Rice,* 652 F.2d 521, 526 (5th Cir. 1981); *United States v. Sink,* 586 F.2d 1041, 1049 (5th Cir.1978), *cert. denied,* 443 U.S. 912, 99 S.Ct. 3102, 61 L.Ed.2d 876 (1979). Thus, the government must demonstrate that Perez knew that the bills he had in his possession were counterfeit.

"Although a defendant's knowledge the notes were counterfeit is necessary to establish the statutory requirement of intent, this guilty knowledge may be inferred from circumstantial evidence, and the surrounding circumstances may supply inferences of knowledge which adequately prove intent." *United States v. Rice,* 652 F.2d at 526. Courts have identified a number of "surrounding circumstances" from which a defendant's knowledge can be inferred. *See, e.g., United States v. Rice, supra* (use of large counterfeit bills for small purchases rather than smaller genuine bills in defend-

---

**5.** Perez apparently consented to the search.

**6.** The record does not clearly reveal how or when Mrs. Perez obtained this money. At oral argument, appellant's counsel indicated that Julio Perez gave the money to Mrs. Perez after he was stopped by Sergeant Green, but before returning to the Omni office.

**7.** In *Bonner v. City of Prichard,* 661 F.2d 1206 (11th Cir.1981) (en banc), this court adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981. *Id.* at 1209.

ant's possession);[8] *United States v. Gonzalez,* 617 F.2d 104 (5th Cir.) (attempt to conceal counterfeit currency while under arrest), *cert. denied sub nom. United States v. Gonzales,* 449 U.S. 868, 101 S.Ct. 202, 66 L.Ed.2d 86 (1980); *United States v. Slone,* 601 F.2d 800, 804 (5th Cir.1979) ("[p]ossession of a substantial amount of money which close observation would reveal to be counterfeit"); *United States v. McCall,* 592 F.2d 1066 (9th Cir.1979) (inconsistent exculpatory statements, use of $100 bills to pay for small items, and fact that defendant had two one-hundred dollar counterfeit bills in pocket other than the pocket where he kept his legitimate currency); *United States v. Casey,* 431 F.2d 953 (5th Cir.1970) (defendant's knowledge that bill had previously been turned down as no good); *Ruiz v. United States,* 374 F.2d 619 (5th Cir.1967) (rapid series of passings); *United States v. King,* 326 F.2d 415 (6th Cir.) (attempt to destroy or abandon counterfeit currency when capture is imminent), *cert. denied,* 377 U.S. 957, 84 S.Ct. 1637, 12 L.Ed.2d 500 (1964); *United States v. Forzano,* 190 F.2d 687 (2d Cir.1951) (furtive conduct).

In this case, we believe that the most important "surrounding circumstance" indicative of appellant's guilty knowledge was his segregation of counterfeit bills from genuine bills. Although Perez had thirty-seven bills in his pants pocket, the three counterfeit bills were not mingled with the thirty-four genuine bills. This segregation of counterfeit bills from genuine bills, which was not explained by Perez' testimony, was strong evidence that Perez knew he possessed counterfeit bills.[9]

In addition, there were several other facts which, when combined with the segregation of bills in appellant's pocket, supported the jury's finding that appellant acted with the requisite intent. First, although he had twenty-nine genuine one-dollar bills in his pocket, Perez attempted to use a counterfeit ten-dollar bill to play the "ball-toss" game.[10] Second, the arrangement of the money taken from Mrs. Perez suggested that someone had been involved in passing counterfeit ten-dollar bills. Finally, the fact that the other counterfeit bills discovered in the Omni's cash registers that evening were printed by the same counterfeiter as the bills confiscated from Perez at least suggested, when coupled with the other evidence, that Perez had been involved in a series of passings.

Viewing these "surrounding circumstances" in their totality, we believe the government presented sufficient evidence from which a reasonable jury could infer that Perez knew that the bills in his possession were counterfeit and, therefore, that Perez had the requisite intent to defraud. Thus, the evidence was sufficient to support his conviction.

AFFIRMED.

---

**8.** *See also Carrullo v. United States,* 184 F.2d 743 (8th Cir.1950) (use of large counterfeit bills rather than change received from prior purchases). *But see United States v. Bean,* 443 F.2d 17 (5th Cir.1971) (evidence that defendant paid for $.83 purchase with a large counterfeit bill taken from wallet which also contained smaller genuine bills held insufficient evidence of guilty knowledge).

**9.** The government also emphasizes that Perez had the counterfeit fifty-dollar bill in his wallet, separate from his other currency. However, this fact does not necessarily indicate that Perez knew the fifty-dollar bill was counterfeit because it is possible that Perez simply had a

practice of keeping large bills in his wallet while placing small bills in his pocket. A similar argument regarding keeping different denominations separate cannot be used to explain the segregation of the currency in Perez' pocket; Perez had ten dollar bills in the "packet" of genuine currency *and* in the "packet" of counterfeit currency.

**10.** It is not clear whether Perez was paying one dollar or three dollars to enter the ball-toss game. *See* note 3 *supra.* In either case, Perez was using a larger bill than was necessary and was adding to the already substantial number of bills in his pocket.